Kent B. ODOM, Appellant–Defendant,

v.

STATE of Indiana, Appellee.

No. 71A04–9805–CR–234.

Court of Appeals of Indiana.

June 23, 1999.

Transfer Denied Aug. 18, 1999.

John Pinnow, Special Assistant to the State Public Defender, Greenwood, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Priscilla J. Fossum, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge

Appellant, Kent B. Odom (Odom), appeals his conviction for Intimidation,[1] a Class C felony.

We affirm.

On appeal, Odom presents the following issues which we restate as follows:

(1) Whether expert testimony, explaining why a victim set forth in the State's hypothetical might have recanted a prior allegation regarding a violent incident, was relevant when the alleged victim testified at the defendant's trial and explained her recantation;[2]

---

1. I.C. 35–45–2–1(a)(1) (Burns Code Ed. Repl. 1998). Specifically, Odom was charged with communicating a threat to Rosetta Odom, with the intent that Rosetta engage in conduct against her will by admitting to having engaged in sexual activity. Pursuant to I.C. 35–45–2–1(b)(2) the charge was·elevated to a Class C felony because Odom committed the act while armed with a deadly weapon.

2. In several places in his appellate brief Odom asserts that the State's expert witness on domestic violence, psychologist Mary Roemer, testified regarding "battered woman's syndrome" (BWS). Battered woman's syndrome is a phenomenon which describes a group of symptomatic behaviors that women exhibit after they have experienced trauma and abuse over time. *Barrett v. State* (1996) Ind.App., 675 N.E.2d 1112, 1115 n.

(2) Whether the probative value of the expert's testimony was substantially outweighed by the danger of unfair prejudice; and

(3) Whether the allegedly erroneous admission of the expert's testimony requires the reversal of Odom's conviction.

The facts relevant to this appeal reveal that on March 8, 1997, Odom's wife, Rosetta, went to a funeral for the day and returned to her mother's home where she and Odom resided, at approximately 4:00 or 5:00 p.m. When Odom returned to the home that evening, he informed Rosetta that he had been watching her all day and accused her of "turning tricks all day." Record at 316. Although Rosetta tried to convince Odom that she had been at the funeral, Odom kept insisting that he knew what Rosetta had been doing. Odom then asked Rosetta to talk with him alone in the dining room of the house. After Odom and Rosetta lay down on the floor to talk, Odom urged Rosetta to stop lying and to admit what she had done. Odom then grabbed Rosetta by her braids and pulled out a knife. When Rosetta insisted that she had been at the funeral, Odom placed the knife to her neck and told her to stop disrespecting him. Odom then threatened to "plunge the knife into the top of [her] head and twist it and lift up" if she "didn't tell him the truth." Record at 319. Eventually, Rosetta was able to escape when Odom was distracted by the television. After the police arrived, Odom was arrested and placed in jail and Rosetta filed a report with the police.

On March 10, 1997, Odom was charged with Intimidation, a Class C felony, Confinement, a Class B felony, and Battery, a Class B misdemeanor. Before trial and while Odom was incarcerated, Rosetta wrote Odom a letter indicating that her prior statements to the police and to the prosecutor regarding the incident were untrue. However, during the jury trial, which commenced on October 14, 1997, Rosetta testified for the State, relating the events which had transpired on March 8, 1997. Rosetta further testified that, although she had written the letter, she did so because Odom had told her to and she believed that he would be released from jail, allowing him to support their family.

During cross examination of Rosetta, the defense questioned Rosetta about the letter in which she recanted. In response, the State offered the testimony of counselor/psychologist Mary Roemer. Over Odom's objection, the State presented Roemer with a

---

3, *trans. denied.* To be considered a battered woman, with regard to BWS, a woman must have experienced at least two violent incidents and thereafter remained in the relationship. *See People v. Christel* (1995), 449 Mich. 578, 537 N.W.2d 194, 200 (discussing the definition of a battered woman as defined by Dr. Lenore Walker in her book entitled *The Battered Woman* (1979)), *reh'g denied.*

The record reveals, however, that Roemer did not attempt to describe the behaviors associated with BWS, opine that Rosetta was a battered woman or suffered from BWS or otherwise refer to BWS. Rather, Roemer testified only that it would not be unusual for a woman, who had experienced a violent incident such as that charged, to recant a prior allegation regarding that incident and the reasons she might have done so. Further, there is no evidence that Rosetta had experienced a prior incident of abuse while she was in the relationship with Odom. In fact, the trial court granted the defendant's motion in limine and other objections at trial to ensure that Odom's prior convictions and the instances of abuse were not disclosed to the jury. Thus, we do not agree that Roemer testified regarding BWS or that Rosetta was a battered woman.

Nevertheless, the purpose for which Roemer's testimony was offered, to explain why a victim might recant, is one of the reasons BWS is offered. *See, e.g., Carnahan v. State* (1997) Ind. App., 681 N.E.2d 1164, 1166 (where BWS evidence was offered by State to explain why the alleged victim recanted at the trial of the defendant charged with battery and intimidation). Additionally, both expert testimony regarding BWS and Roemer's testimony are based upon specialized knowledge concerning the psychological dynamics and common reactions of victims of domestic violence. In the instant case, for example, Roemer based her testimony upon her several years of counseling psychology, and in particular, her eight years of working "principally with victims of domestic violence" and women "who had been battered." Record at 354. Therefore, despite the fact that Roemer did not specifically testify regarding BWS, because Roemer's testimony is similar to BWS testimony, we will determine the admissibility of Roemer's testimony as the admissibility of BWS and other pattern, profile and syndrome evidence are determined.

hypothetical, which was based upon facts introduced at the trial, and asked Roemer whether it would be unusual for the victim in that hypothetical to recant a prior allegation. After Roemer concluded that it would not, she attempted to explain why the victim might have recanted, offering reasons some of which were similar to and some of which were different from those offered by Rosetta. Thereafter, the jury returned its verdict, finding Odom guilty only of intimidation.

### I. Relevancy of Roemer's Testimony

 Odom argues that the trial court erroneously permitted expert Mary Roemer to explain why the victim presented in the State's hypothetical might have recanted a prior allegation regarding that violent incident.[3] Specifically, Odom contends that Roemer's testimony that the victim might have recanted because of 1) an emotional attachment to the perpetrator; 2) a belief that the incident would not recur; 3) a learned behavior of quickly forgiving the perpetrator of the abuse;[4] 4) a desire to mollify the defendant's anger; and/or 5) a fear of surviving economically,[5] was irrelevant in light of the fact that Rosetta had already testified that she had recanted because Odom told her to and she had financial concerns.

 Decisions regarding the admissibility of expert testimony are within the broad discretion of the trial court. *Hook v. State* (1999) Ind.App., 705 N.E.2d 219, 220, *trans. denied.* We will reverse only upon a showing that the trial court abused its discretion in permitting particular testimony.

The State, relying upon *Carnahan v. State* (1997) Ind.App., 681 N.E.2d 1164, contends that Roemer's testimony was relevant to explain why Rosetta recanted and to prove that she was credible despite her recantation. In *Carnahan*, this court found that expert testimony regarding battered woman's syndrome was admissible at the trial of a defendant charged with battery and intimidation to explain why the victim, who had previously filed a written report claiming that the defen-

3. Odom does not appear to argue that Roemer was erroneously permitted to testify that, in her opinion, it would not be unusual for a person who had experienced such an incident to recant a prior allegation. Roemer's opinion was offered in response to the State's hypothetical question which was based upon the facts of this case and only after Rosetta's credibility had been called into question. Therefore, it was admissible to show that Rosetta's post-incident behavior was not inconsistent with Rosetta's claim that the incident had occurred. *See, e.g., Steward v. State* (1995) Ind., 652 N.E.2d 490, 499 (discussing the admissibility of child sexual abuse syndrome and noting that reliable expert testimony "regarding the prevalence of the specific unexpected behavior within the general class of reported child abuse victims" may be admissible when defendant presents or implies unexpected behavior by child which would appear inconsistent with claim of abuse), *reh'g denied.* Although *Steward* involved the admissibility of child sexual abuse syndrome, we find its reasoning instructive in the instant case. *See also Hook v. State* (1999) Ind. App., 705 N.E.2d 219, 222 n. 3 (listing cases which have found admissible expert opinion as to whether victim's conduct "was or was not typical of that class of victims"), *trans. denied.*

4. In his brief, Odom suggests that Roemer testified that a victim might recant because she was "used to abuse." Appellant's Brief at 8. However, we do not believe that this is a fair interpretation of Roemer's testimony. Specifically, Roemer testified as follows: "[the victim of a violent incident] might operate on a background and a context of perhaps family history of forgiveness based on very scanty evidence; in other words she might be very used to that kind of thing. Kind of trained in that, inured to that." Record at 364. Explaining this statement further Roemer stated that "an individual who was accustomed to something in her formative years; that is someone forgiving another person based on scanty evidence, that he was contrite, that she was ... accustomed to seeing that quick and easy forgiveness ... she would be likely to do that again herself in her adult years." Record at 368. The essence of Roemer's testimony is that a victim learns the behavior of quickly forgiving another during her formative years by observing other people. It is this learned behavior which explains the victim's decision to recant. Although it is possible that once a person learns this behavior, she may engage in the behavior following a violent incident, it does not necessarily follow that she is "used to abuse." Therefore, we reject Odom's characterization of Roemer's testimony.

5. The record reveals that Roemer listed additional reasons for the recantation. For example, Roemer testified that a person who experiences a stressful incident might recant in order to avoid remembering that incident. Record at 369. However, Odom challenges only those reasons listed above. Therefore, for purposes of this appeal, we consider only those reasons raised by Odom.

dant had abused her, had recanted her prior allegations in her trial testimony. We analyzed the admissibility of the evidence under Ind. Evidence Rule 401 [6] and concluded that the expert's testimony, which suggested that the victim may have reconciled with the defendant or was apprehensive about leaving him when she recanted, was relevant because it tended to show that the victim's trial testimony was less credible than her pre-trial report and, therefore, directly affected the victim's credibility. *Id.* at 1167.

Although we agree that in both *Carnahan* and the instant case, the expert's testimony was offered with regard to the victim/witness' credibility, in *Carnahan* to impeach and here to rehabilitate, there is a critical distinction which prevents us from applying *Carnahan* so readily. In *Carnahan,* the victim/witness recanted at the trial of the defendant and, therefore, it would have been incongruous that such a witness would have provided an explanation for her recantation. Thus, had the expert not testified, the jury would not have been provided with an explanation for the victim/witness' recantation. In the instant case, however, Rosetta recanted before the trial and testified on behalf of the State. Therefore, Rosetta was able to explain her own recantation to the jury. Consequently, in this case, unlike in *Carnahan,* the expert's opinion was offered upon an issue which had already been addressed by the victim/witness. Therefore, contrary to the State's assertion, *Carnahan* does not address the precise issue raised by Odom. As a result, we must turn to our rules of evidence to determine whether expert testimony, which is offered to rehabilitate a witness and which explains why a victim might have recanted, is relevant even though the victim/witness has testified and has offered an explanation for her recantation.

Ind. Evidence Rule 401 provides that relevant evidence is evidence having "[a] tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Thus, in order for Roemer's testimony to be considered relevant it must meet this requirement. *See Steward, supra,* 652 N.E.2d at 498 (in order for expert testimony to be relevant it must meet the relevancy requirements of Ind. Evidence Rule 401); *Carnahan, supra,* 681 N.E.2d at 1166 (same). Here, the jury was presented with inconsistent statements and was called upon to decide whether Rosetta's letter or her in-court testimony was more credible. Thus, testimony such as that provided by Roemer would appear to be relevant as it clearly tended to show that Rosetta's in-court testimony was more credible than her prior statement.[7]

■ Nevertheless, Odom seems to suggest that a victim/witness who provides an explanation for her recantation has provided the sole relevant evidence on that question.[8] By making this assertion, Odom assumes that the victim/witness is able to understand the complexity of her behavior and to provide all relevant reasons which may exist for the recantation. Odom also assumes that the victim/witness is willing to admit all of those reasons to a jury. We cannot agree with that assumption.

Most courts agree that the reactions and behaviors of domestic violence victims are not commonly understood by lay persons. *See Commonwealth v. Goetzendanner* (1997), 42 Mass.App.Ct. 637, 679 N.E.2d 240, 244 (pattern of behavioral and emotional characteristics common to victims of domestic violence lies beyond knowledge of ordinary juror and, therefore, is proper subject

---

**6.** Evid. R. 401 provides that relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**7.** Odom did not object upon grounds that Roemer's testimony improperly bolstered or vouched for Rosetta's testimony. *See Steward v. State, supra,* 652 N.E.2d 490. Therefore, we do not address the arguable tension between improper

vouching and relevant testimony bearing upon credibility.

**8.** In particular, Odom asserts that "[p]sychologist Roemer's testimony on possible reasons why Rosetta Odom recanted was irrelevant because Rosetta Odom told the jury why she recanted. . . . Psychologist Roemer could add nothing relevant to Rosetta Odom's explanation. . . ." Appellant's Brief at 15.

of expert testimony), *review denied; State v. Grecinger* (1997) Minn., 569 N.W.2d 189, 195 (expert testimony on battered woman's syndrome "would help to explain a phenomenon not within the understanding of an ordinary lay person."); *Arcoren v. United States* (1991) 8th Cir., 929 F.2d 1235, 1240 (testimony concerning battered woman's syndrome is not within the common knowledge of the jurors), *reh'g denied, cert. denied,* 502 U.S. 913, 112 S.Ct. 312, 116 L.Ed.2d 255. Thus, a witness, as a lay person, although she may offer her reasons for the recantation, may not understand completely the complexity of her behavior. Further, even assuming the witness understands her behavior and all of the reasons for that behavior, she may not be willing to admit all of them to a jury. However, an expert such as Roemer, who was undisputedly qualified as an expert in domestic violence, is able to offer those additional reasons [9] which may aid the jury in determining the witness' credibility. Therefore, we cannot conclude that because a victim/witness provides an explanation for her recantation, expert testimony which also tends to explain the witness' recantation is necessarily irrelevant.

■ Having reached this conclusion, we still must determine whether the reasons offered by Roemer were relevant in determining Rosetta's credibility. Here, the State chose to elicit Roemer's opinion through the use of the following hypothetical question which was based upon facts adduced at trial:

If you would Ms. Roemer, assume a woman is in [an] approximately fourteen year relationship with a man which includes a four year marriage to that man most recently. That the woman and the man bear a child together. Assume that she discloses an incident which occurred, which

began with a man accusing her of infidelity; more specifically of having turned a trick. And assume further that this man holds a butcher knife on the woman, grabs her hair, and held the butcher knife to her neck. Assume that the man then put the knife to the top of the woman's head, and told her he was going to stick it in her head, twist it, and lift it up. Assume further that that man also said to the woman that he would give her fifteen minutes to admit her infidelity or that he would kill her, and later gave her two minutes before he would kill her. Assume that she fled from the man, and that the police were called. And that on the night of that incident, she reported to the police what had happened. Assume further, that the man is taken to jail, and that he begins to contact her and she visits him. Assume further that she then writes a letter to the man while he's in jail saying that what she told the police was a lie. Based on your training and experience in the area of domestic violence, can you tell me Mrs. Roemer ... if you have an opinion whether it would be unusual for a woman who had gone through the experience I just recounted to later recant, take back, what she said, had happened on the night of the incident?

Record at 358–59. After Roemer concluded that it would not have been unusual for the victim to recant, the State addressed Roemer as follows:

Q. Ms. Roemer, you said it wouldn't be unusual for a victim to recant *under the set of facts I presented in my hypothetical,* is that right?

A. That's right.

9. We also note that by allowing an expert to provide reasons for a victim's recantation, she may offer reasons which reiterate those given by the victim/witness, as occurred in the instant case. However, the issue is not relevancy. Clearly, the explanation offered by the expert is relevant for the same reason the witness' own testimony is relevant, to explain why the victim recanted. Further, by providing a similar response, the expert communicates to the jury that the victim's response is common among victims of domestic violence. Under these circumstances, the real concern is whether the expert improperly bolstered or vouched for the victim/witness' testimony. However, this court has consistently found that so long as the expert does not directly comment upon the witness' credibility the testimony is admissible. *See, e.g., Hook, supra,* 705 N.E.2d at 222 (finding that expert's testimony that it was not uncommon for children to give inconsistent statements over time was not improper vouching testimony as testimony was only indirect comment on child's credibility rather than direct comment that victim's testimony was trustworthy, that victim was telling the truth or that victim was reliable and credible witness).

Q. And can you explain to me why that is?

Record at 363 (emphasis supplied). Roemer did not have personal knowledge of the case and had not counseled Rosetta. Therefore, the State properly presented Roemer with and sought a response based upon a hypothetical question supported by facts which had been adduced at trial. *See Henson v. State* (1989) Ind., 535 N.E.2d 1189, 1192 (hypothetical question proper if it embraces facts that have been placed into evidence); *Ashby v. State* (1985) Ind., 486 N.E.2d 469, 475 (hypothetical question may be used to obtain expert's opinion when expert has no personal knowledge of the facts), *reh'g denied.* Thus, in order for Roemer's testimony to be relevant it must have been based upon some fact presented in the hypothetical or some reasonable inference drawn therefrom.

Here, Roemer's suggestion that the victim might have recanted because of financial concerns was supported by the fact that the assailant was in jail and the reasonable inference that he would not have been able to support his family until after he was released. Additionally, Roemer's suggestion that the victim might have recanted because she had an emotional attachment to her abuser was supported by the fact that the victim in the hypothetical had been involved with her attacker for more than fourteen years, married to him for four of those years and had a child with him. Further, Roemer's suggestion that the victim might have recanted because she wanted to pacify her assailant could also be inferred from the fact that the victim recanted while her attacker was in jail from where he was unable to harm her. Finally, Roemer's suggestion that the victim might have believed that the incident would not recur was also supported by the fact that the victim had visited her attacker while he was in jail.

However, we cannot conclude that Roemer's suggestion that the victim might have recanted because she had learned to forgive her assailant was based upon the facts presented in the hypothetical or any reasonable inferences which could be drawn therefrom. There is no evidence that the assailant had apologized to the victim or that the victim had forgiven him. Further, during her testimony regarding learned forgiveness, Roemer conceded that she was not being "case specific." Record at 368. Because Roemer's opinion regarding learned forgiveness was not based upon any fact in the State's hypothetical, it could not have tended to explain why Rosetta recanted. Therefore, it was not appropriately admitted.

## II. Rule 403 Prejudice

■ Next, Odom argues that, even assuming Roemer's testimony was relevant,[10] pursuant to Evid. R. 403 its probative value was substantially outweighed by the danger of unfair prejudice. Specifically, Odom contends that Roemer's testimony, especially her use of words such as Stockholm syndrome, separation abuse, stress reaction, stress disorder and victimization, implied that Rosetta was used to being threatened and battered and that Odom was a "wife beater." Appellant's Brief at 18.

Evid. R. 403 provides in pertinent part that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." We review a trial court's evidentiary ruling under Evid. R. 403 using the same standard as for relevancy issues. That is, we reverse the trial court's ruling only for an abuse of discretion. *Cadiz v. State* (1997) Ind.App., 683 N.E.2d 597, 598.

Here, the probative value of Roemer's testimony was significant because it tended to show that despite the recantation, Rosetta was a credible witness with regard to the incident on March 8, 1997. In light of the fact that Rosetta's testimony was the sole evidence offered to show that Odom had threatened her, Roemer's testimony had significant probative value. Further, the probative value of Roemer's testimony was not substantially outweighed by the danger of unfair prejudice.

10. Because we conclude that Roemer's testimony regarding learned forgiveness was not relevant, and therefore inadmissible, we need not determine whether it was prejudicial under Evid. R. 403. Rather, we address only whether the admission of that testimony amounted to reversible error in Section III.

As noted, Roemer's testimony was limited to explaining why the hypothetical victim of the violent incident might have recanted and did not suggest that Rosetta was a battered woman or that she suffered from battered woman's syndrome. Further, Roemer's testimony was offered for the sole purpose of showing that Rosetta was credible and not to show that Rosetta had been battered or intimidated. Thus, Odom was not faced with the danger that the jury might conclude that because Rosetta fit the profile of a battered woman, Odom necessarily beat and intimidated her. See Carnahan, supra, 681 N.E.2d at 1168 (concluding in part that probative value of expert testimony regarding battered woman's syndrome was not outweighed by danger of unfair prejudice when testimony was offered on the issue of witness' credibility and not to show that defendant committed charged acts). Additionally, because Roemer did not know Rosetta, had not counseled her, and did not have personal knowledge of the case, she could not have offered a direct and inadmissible opinion concerning Rosetta's credibility. See, e.g., People v. Morgan (1997), 58 Cal.App.4th 1210, 68 Cal.Rptr.2d 772, 775 (finding that where expert has not spoken with victim/witness and expresses no opinion about particular victim's behavior, it is less likely that jury will interpret expert's testimony as statement concerning truthfulness of victim/witness' statements). Further, although Roemer, by suggesting that the victim in the hypothetical might have recanted for financial reasons, offered one of the same reasons given by Rosetta, it was not improper vouching testimony as Roemer referred to a hypothetical victim and did not directly comment on Rosetta's credibility. See, e.g., Hook, supra, 705 N.E.2d at 222 (finding that expert's testimony that it was not uncommon for children to give inconsistent statements over time, was not improper vouching testimony as expert only indirectly commented on child's credibility and did not state that witness was trustworthy, that victim was telling the truth or that witness was reliable and credible); Fleener v. State (1995) Ind.App., 648 N.E.2d 652, 660 (expert opinion on child victim's delay in reporting sexual abuse, inability to recall specific dates and lack of emotion, elicited through hypothetical questions, did not improperly bolster child witness' testimony as it was not direct comment on credibility of victim), summarily affirmed and vacated on other grounds by Fleener v. State (1995) Ind., 656 N.E.2d 1140.

Finally, although Roemer used words such as Stockholm syndrome, separation abuse, stress reaction, stress disorder and victimization, she explained each of these terms and referred to them in the context of her testimony explaining why victims recant. For example, Roemer testified that "Stockholm syndrome" was a phenomenon in which the "assailant is viewed as all powerful and therefore one's very survival depends upon that individual" and that "separation abuse" occurs after a violent incident has taken place and the victim experiences heightened anxiety and fear while the perpetrator is in jail. Record at 365. Roemer further explained that to alleviate the "separation abuse" a victim might recant an allegation of abuse while the alleged perpetrator was in jail to pacify him prior to his release. Record at 366. Roemer also testified that a victim suffering from a stress reaction or stress disorder might avoid anything which reminded her of the stressful event, including a prior allegation. Finally, Roemer's reference to victimization was made only once during her testimony on stress reactions. In light of the fact that Roemer's testimony was limited to the reasons the victim in the State's hypothetical might have recanted, did not include an opinion as to why Rosetta recanted or directly comment on the truthfulness of Rosetta's testimony, and was offered for the sole purpose of rehabilitating the State's witness, we conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Thus we follow our Supreme Court's determination in Steward, supra, 652 N.E.2d at 499, in which the Court, although discussing the admissibility of child sexual abuse syndrome, quoted with approval State v. Moran (1986), 151 Ariz. 378, 728 P.2d 248, 251–52, which found that "evidence [offered for rehabilitative purposes] may harm defendant's interests, but we cannot say it is unfairly prejudicial; it merely informs jurors that commonly held assumptions are not nec-

essarily accurate and allows them to fairly judge credibility." (emphasis in original).

### III. Harmless Error

Finally, because we have concluded that Roemer's testimony regarding learned forgiveness was not relevant, we must determine whether the admission of that evidence requires reversal of Odom's conviction. No error in the admission of certain evidence will result in reversal unless the failure to grant a new trial is inconsistent with substantial justice. Ind. Trial Rule 61. Reversal is required only if the record reveals that the improper evidence was likely to have had a prejudicial impact on the average juror such that it contributed to the verdict. *Sundling v. State* (1997) Ind.App., 679 N.E.2d 988, 994, *reh'g denied.*

In the instant case, there is no question that Rosetta's credibility was at issue. In fact, because Rosetta was alone with Odom when he threatened to stab her with the knife, it was necessary that the jury believe her testimony in order to enter a guilty verdict. However, because the jury was presented with several reasons for Rosetta's recantation which were supported by the evidence, including the reasons offered by Rosetta, we cannot say that the erroneously admitted evidence was likely to have had a prejudicial impact on the jury such that it contributed to Odom's conviction for intimidation.

As stated above, Rosetta testified at the trial and explained that she had recanted because Odom told her to and she had financial concerns. Consequently, the jury was able to observe her demeanor and could have properly concluded that, based on her testimony alone, Rosetta was a truthful witness and had recanted for the reasons offered during her testimony. *See Johnson v. State* (1989) Ind., 541 N.E.2d 518, 519 (jury may properly credit testimony of lay witness over testimony of expert witness). The jury also could have properly chosen to believe any of Roemer's explanations which they found were supported by the evidence. Thus, it would have been extremely unlikely that the jury would have ignored Rosetta's explanation or any of Roemer's reasons which were supported by the facts and reasonable inferences, to adopt the one reason which was not based upon the evidence. Further, Odom's attorney made clear to the jury during her cross examination of Rosetta that a particular victim's response(s) to a violent incident vary and that because Roemer had not spoken with Rosetta, Roemer could not definitively say whether Rosetta had recanted for any of the reasons she suggested. Under these circumstances, we cannot say that the admission of Roemer's testimony regarding learned forgiveness had a prejudicial impact on the jury such that it contributed to Odom's conviction. The admission of Roemer's testimony regarding learned forgiveness did not amount to reversible error.

The judgment is affirmed.

RUCKER, J., and DARDEN, J., concur.